1

2

3

4 UNITED STATES DISTRICT COURT

5 NORTHERN DISTRICT OF CALIFORNIA

6

| | |
|---|---|
| 7 FACEBOOK, INC., et al., | Case No.  20-cv-06023-JCS |
| 8          Plaintiffs, | |
| 9   v. | **REPORT AND RECOMMENDATIONS REGARDING MOTION FOR DEFAULT JUDGMENT** |
| 10 NIKOLAY HOLPER, | Re: Dkt. No. 39 |
| 11          Defendant. | |

## I.      INTRODUCTION

Plaintiffs Meta Platforms, Inc. f/k/a Facebook, Inc. and Instagram, LLC (collectively, "Facebook") move for default judgment against Defendant Nikolay Holper, an individual residing in Belarus.  The undersigned magistrate judge held a hearing on January 28, 2022, and thereafter took supplemental briefing.  For the reasons discussed below, the undersigned recommends that the motion be GRANTED IN PART and DENIED IN PART.

Because not all parties have appeared and consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c), the case will be reassigned to a United States district judge for all further proceedings, including action on the recommendations of this report.  Facebook shall serve a copy of this report on Holper by the same means the undersigned previously authorized to serve the complaint, and file proof of service to that effect.  Any party may file objections to the recommendations herein no later than fourteen days after being served with this report.

## II.      BACKGROUND

### A.      Allegations of the Complaint

Because a plaintiff's allegations are generally taken as true in the context of default judgment, this section summarizes Facebook's allegations as if true.  Nothing in this section should be construed as resolving any question of fact that might have been disputed had Holper

1    appeared in the case.

2        Facebook's Instagram product is a social network for sharing photographs and videos.

3    Compl. (dkt. 1) ¶ 13.  Among other features, registered users can follow one another, "like" other

4    users' posts, and comment on posts.  *Id.* ¶ 15.  All users must agree to terms of use, which:

5               prohibit users from (a) "do[ing] anything unlawful, misleading, or
               fraudulent or for an illegal or unauthorized purpose;" (b)
6               "interfer[ing] or impair[ing] the intended operation of [Instagram];"
               (c) "attempt[ing] to buy, sell, or transfer any aspect of [an Instagram]
7               account;" (d) "creating accounts or collecting information in an
               automated way . . . ;" and (e) "violat[ing] (or help[ing] or
8               encourag[ing] others to violate) [Instagram] terms or their policies
               including . . . the Instagram Community Guidelines."
9

10   *Id.* ¶¶ 16–17 (alterations in original).  The community guidelines incorporated by the terms of use

11   "prohibit users from 'artificially collecting likes, followers, or shares,' and 'create[ing] accounts

12   for the purpose of violating [Instagram's] guidelines.'"  *Id.* ¶ 19 (alterations in original).

13       The terms of use also limit use of Instagram's intellectual property to circumstances

14   expressly permitted by Instagram's "Brand Guidelines," which "prohibit using the marks in a way

15   that '[m]akes the Instagram brand the most distinctive or prominent feature,' '[i]mplies

16   partnership, sponsorship or endorsement,' or 'combine[s] "Insta" or "gram" with [the user's] own

17   brand.'"  *Id.* ¶ 18 (alterations in original).  Facebook holds multiple registrations for the

18   INSTAGRAM word mark.  *Id.* ¶¶ 21–22 & Ex. 2.

19       Doing business as "Nakrutka," Holper has offered services "designed to artificially inflate

20   the 'likes,' 'comments,' 'views,' and 'followers' of Instagram accounts" since June 26, 2017 at the

21   latest.  *Id.* ¶ 1.  He charges fluctuating prices depending on the type and volume of engagement to

22   be purchased and the degree of apparent authenticity desired.  *Id.* ¶¶ 32–34 & Exs. 4, 7.  Using a

23   "a network of bots and Instagram accounts," Holper has "deliver[ed] millions of automated likes

24   to his customers," including "over 8 million likes over the course of just two days."  *Id.* ¶ 35.

25   Instagram users with no followers have been able to purchase from Holper thousands of likes at a

26   time; Facebook offers examples of photographs receiving up to 10,000 likes within minutes of a

27   purchase.  *Id.* ¶ 36.   In January of 2020, Facebook learned that Holper has registered and used the

28   "instagram.by" domain since no later than 2017.  *Id.* ¶ 23.  Since no later than August of 2020,

1    Holper has referred to his service with the names "CHEAT INSTAGRAM" and "INSTAGRAM

2    BOOST," used the email address "info@instagram.by," and included a false copyright notice

3    reading "© NAKRUTKA INSTAGRAM 2017-2019" on his websites, including nakrutka.cc. *Id.*

4    ¶ 25.

5           According to Facebook, Holper's conduct "interfered and continues to interfere with

6    Instagram's service and burden Facebook and Instagram's computer network," and has harmed

7    Facebook's brand and goodwill by "creat[ing] an inauthentic experience for Instagram users who

8    used, viewed, and relied on [Holper's] fake engagement services." ¶ 37.

9           On January 1, 2020, Facebook disabled Holper's Facebook and Instagram accounts, told

10   him that his access had been revoked, and notified him that "that his fake engagement activity

11   violated Facebook's and Instagram's [terms of use] and U.S. law." *Id.* ¶ 26.  Holper responded by

12   "indicating that he refused to cease his unlawful activities," and posted on an internet forum that

13   Facebook had blocked his access. *Id.* ¶¶ 26–27 & Ex. 5.  Since then, Holper has continued to

14   provide the same fake engagement services through his websites. *Id.* ¶ 28.  In February of 2020,

15   Facebook sent Holper a cease and desist letter, to which he did not respond. *Id.* ¶¶ 29–31 & Ex. 6.

16          Facebook asserts the following claims: (1) breach of contract, specifically the Instagram

17   terms of use, brand guidelines, and community guidelines, *id.* ¶¶ 41–48; (2) violation of California

18   Penal Code section 502, Compl. ¶¶ 49–55; (3) violation of the Computer Fraud and Abuse Act

19   ("CFAA"), 18 U.S.C. § 1030, Compl. ¶¶ 56–66; (4) unjust enrichment, *id.* ¶¶ 67–76;

20   (5) trademark and service mark infringement in violation of 15 U.S.C. § 1114, Compl. ¶¶ 77–86;

21   (6) infringement and false designation of origin in violation of 15 U.S.C. § 1125(a), Compl. ¶¶ 87–

22   97; (7) dilution of trademarks in violation of 15 U.S.C. § 1125(c), Compl. ¶¶ 98–106; and

23   (8) cybersquatting in violation of 15 U.S.C. § 1125(d), Compl. ¶¶ 107–20.  The complaint seeks

24   injunctive relief, damages, disgorgement, and attorneys' fees. *See* Compl. at 19–22 (prayer for

25   relief).

26          **B.    Procedural History**

27          Facebook filed this case on August 27, 2020.  Completing service on Holper, who lives in

28   Belarus, proved challenging.

United States District Court
Northern District of California

Based on Facebook's diligent but unsuccessful attempt to serve Holper via the Hague Convention, the undersigned on September 27, 2021 authorized service through alternative means under Rule 4(f)(3) of the Federal Rules of Civil Procedure.  That order provided that Facebook could "serve [Holper] by completing *both* of the following: (1) sending summons, the complaint, and a copy of this order to [Holper] at the three email addresses identified in [Facebook's] motion (info@instragram.by, jaholper@gmail.com, and mail@holper.by); and (2) mailing the same documents to [Holper] at 22 Volkova Street, Apartment #2, Zhlobin, Gomel, Belarus," and that service would "be effective upon completion of those steps and filing proof of service."  Order re Service (dkt. 27).

Facebook filed proof of service (dkt. 28) on September 30, 2021 indicating that it completed services as instructed on September 27, 2021.  The Clerk entered Holper's default (dkt. 32) on November 4, 2021.  Facebook filed its present motion (dkt. 39) on December 20, 2021.

### C.   Facebook's Motion

Facebook asserts that the Court has federal question jurisdiction over its federal claims pursuant to 28 U.S.C. § 1331, supplemental jurisdiction over its state claims pursuant to 28 U.S.C. § 1367, and also diversity jurisdiction over all claims pursuant to 28 U.S.C. § 1332.  Mot. (dkt. 39) at 4.

Facebook asserts that Holper consented to this Court's personal jurisdiction by accepting the Instagram terms of use, although it initially failed to offer a copy of those terms as evidence.  *Id.* at 4–5.  As a separate basis for personal jurisdiction, Facebook contends that Holper purposefully directed his conduct to this forum when he sold fake engagement to California users, employed California IP addresses to deliver those services, and targeted a business based on California (Instagram), which is where the harm that he caused was inflicted.  *Id.* at 5–9.  Facebook also presents an argument based on purposeful availment.  *Id.* at 9–10.  Facebook notes that Holper was properly served in accordance with the undersigned's previous order authorizing service by mail and email.  *Id.* at 11.

Facebook argues that each of the factors enumerated in *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986), favors entry of default judgment.  Mot. at 11–20.  Addressing the factors

4

United States District Court
Northern District of California

1  that relate to the merits of its claims, Facebook contends that each of its claims is well founded

2  and sufficiently alleged.  *Id.* at 12–19.  Turning to remedies, Facebook argues that its Lanham Act

3  claims warrant statutory damages, *id.* at 20–22; its breach of contract, CFAA, section 502, and

4  Lanham Act claims warrant injunctive relief, *id.* at 22–23; and its section 502 claim warrants an

5  award of attorneys' fees, although Facebook did not initially set forth a specific amount of fees it

6  has incurred, instead asking the Court to award Facebook its "reasonable attorneys' fees and costs

7  in this matter, the amounts of which should be determined following the granting of this motion, at

8  which point [Facebook] will submit an affidavit in support of the same," *id.* at 23–24.

9       Facebook requests statutory damages totaling $6,100,000, consisting of two million dollars

10  for each of three websites allegedly infringing Facebook's trademarks and one hundred thousand

11  dollars for cybersquatting based on Holper's registration of the instagram.by domain.  *Id.* at 20–

12  22.  It seeks a permanent injunction barring Holper from:

13          a. Accessing or attempting to access Facebook and Instagram's
14          service, platform, and computer systems;

15          b. Creating or maintaining any Instagram accounts in violation of
        Instagram's Terms of Use;

16          c. Engaging in any activity that disrupts, diminishes the quality of,
17          interferes with the performance of, or impairs the functionality of
        Facebook and Instagram's service, platform, and computer systems;

18          d. Engaging in any activity, or facilitating others to do the same, that
19          violates Instagram's Terms of Use, Community Guidelines, or other
        related policies;

20          e. Engaging in any use, including advertising, promoting, marketing,
21          franchising, selling, and offering for sale any goods or services, in
        connection with the Instagram trademarks, or any similar mark or
22          designation, that is likely to cause confusion, or to cause mistake as
        to the affiliation of that use with Instagram;

23          f. Engaging in any activity which tarnishes or lessens the
24          distinctiveness of the Instagram trademarks; and

25          g. Registering, trafficking, or using any domain name that is identical
        or confusingly similar to any of the Instagram trademarks.

26  Proposed Order (dkt. 39-2) at 1–2.

27       To support its motion, Facebook offered a declaration by its researcher and threat

28  investigator Andrew Herter, who states that Holper used "more than 48,000 Instagram accounts to

5

United States District Court
Northern District of California

1    deliver fake engagement . . . to more than 38,000 Instagram accounts belonging to users in the

2    United States," by "artificially increasing the likes and followers for certain Instagram accounts."

3    Herter Decl. (dkt. 39-1) ¶ 4(a).  According to Herter, many of Holper's Instagram accounts and the

4    accounts that received his fake engagement use California IP addresses.  *Id.* ¶ 4(c).  Herter

5    includes a machine-translated screenshot of Holper's website at nakrutka.by, which automatically

6    redirected to nakrutka.com.  *Id.* ¶ 5 & Ex. A.  The translated website prominently features the text

7    "INSTAGRAM BOOST," includes "© NAKRUTKA INSTAGRAM 2017-2019" at the bottom of

8    the page, and lists the email address "info@instagram.by."  *Id.* Ex. A.

9         **D.    The Hearing**

10        At the hearing, the undersigned magistrate judge asked Facebook to provide copies of the

11   terms of use and guidelines on which it relies that were in effect at the relevant times, as opposed

12   to merely a URL for the current documents that have since been revised.  The undersigned

13   requested supplemental briefing as to whether Holper used the Cyrillic or Latin alphabet on his

14   websites and the significance of using a different alphabet from Facebook's trademark if he used

15   Cyrillic, noting that Facebook initially provided only translations.  The undersigned asked

16   Facebook to address whether a Cyrillic version could be considered a counterfeit mark, and if not,

17   how that would affect Facebook's entitlement to damages under the Lanham Act.  The

18   undersigned requested additional evidence, as opposed to merely allegations in the complaint, to

19   support Facebook's request for the maximum allowable statutory damages.  The undersigned also

20   requested briefing as to whether the context of Holper's use supported likelihood of confusion or

21   could implicate a fair use defense.  Finally, the undersigned asked Facebook to request its

22   attorneys' fees now rather than waiting until after the Court rules on the motion for default

23   judgment.

24        **E.    Facebook's Supplemental Brief and Evidence**

25        Following the hearing, Facebook submitted supplemental briefing and evidence in

26   response to the undersigned's concerns.  Facebook contends that it has now provided the

27   supplemental materials the undersigned requested, Supp'l Br. (dkt. 44) at 1, that Facebook's

28   allegations must be taken as true and Holper waived any affirmative defenses, *id.* at 1–2, 4, that

6

United States District Court
Northern District of California

even if Holper had not waived his defenses, he would not be able to show fair use, *id.* at 5–8, that Holper's use of a Cyrillic version of the INSTAGRAM mark is a breach of contract and likely to cause confusion, *id.* at 2–3, that Holper's conduct was sufficiently willful to support statutory damages, *id.* at 8–9, and that Facebook should be awarded attorneys' fees totaling $178,702 and costs totaling $10,184.44, *id.* at 9–22.

Facebook has now provided original Cyrillic-alphabet screenshots of Holper's website, Andre Decl. Exs. A–C, as well as the terms of use and guidelines applicable to users in Belarus during the period at issue, *see generally* Sharpe Decl. (dkt. 44-4).  The version effective April 19, 2018 includes the terms previously recited in Facebook's complaint.  *See, e.g.*, Sharpe Decl. Ex. A at ECF p. 40[1] (prohibiting "anything unlawful, misleading, or fraudulent or for an illegal or unauthorized purpose," "interfer[ing] or impair[ing] the intended operation of [Instagram]," "attempt[ing] to buy, sell, or transfer any aspect your account," "creating accounts or collecting information in an automated way," and violating or encouraging violations of the community guidelines or brand guidelines); *cf.* Compl. ¶¶ 16–17 (same).  An earlier version that took effect in 2013 uses somewhat different language, but imposes substantially the same restrictions and obligations.  *See, e.g.*, Sharpe Decl. Ex. A at ECF p. 6 (prohibiting, e.g., use for unauthorized purposes, disruption of Instagram's services, violation of the community guidelines, and creating accounts using automated means).  The community guidelines prohibit "artificially collecting likes, followers, or shares."  *Id.* at 44, 47, 50, 54, 58, 62, 67, 71, 75.

Facebook has also now provided a translated interview with Holper published by a Belarussian website in which Holper stated that his services "may violate some Instagram rules" and that he does not intend to comply with Facebook's request to cease his activities, Herter Supp'l Decl. (dkt. 44-3) Ex. A, a translated screenshot of Holper's public Telegram social media

---

[1] Sharpe's declaration includes multiple versions of the terms of use, some apparently identical and each with its own internal pagination, as a single exhibit.  This report cites those documents using the page numbers assigned by the Court's ECF filing system.  In the future, counsel is encouraged to file separate documents as separate exhibits, with a sufficient explanation of the relevance of each document.

channel where he provided updates about his services, Andre Decl. Ex. D,[2] and evidence

supporting its costs and attorneys' fees, *see generally* Mortimer Decl. (dkt. 44-1).

## III.   ANALYSIS

### A.   Legal Standard

After default has been entered against a party, a district court may grant an application for

default judgment in its discretion.  *See* Fed. R. Civ. P. 55(b)(2).  If the court is satisfied that

jurisdiction is proper and that service of process upon the defendant was adequate, it then

considers several factors in determining whether to grant default judgment:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471−72 (9th Cir. 1986).  In making its decision, the court takes

all factual allegations in the complaint, except those relating to damages, as true.  *TeleVideo Sys.,*

*Inc. v. Heidenthal*, 826 F.2d 915, 917−18 (9th Cir. 1987) (citing *Geddes v. United Fin. Grp.*, 559

F.2d 557, 560 (9th Cir. 1977)).

### B.   Jurisdiction and Service of Process

A court considering a motion for default judgment must determine whether it has both

subject matter jurisdiction and personal jurisdiction, and dismiss sua sponte if it does not.  *In re*

*Tuli*, 172 F.3d 707, 712 (9th Cir. 1999).  Here, the Court has subject matter jurisdiction under the

federal question statute, 28 U.S.C. § 1331, because Facebook asserts federal claims under the

Lanham Act and the CFAA.  The Court has supplemental jurisdiction over Facebook's related

---

[2] While not relevant to the outcome, the undersigned puts little stock in the translated interview and Telegram channel, both of which Facebook's witnesses state were machine-translated using "publicly available tooling."  *See* Andre Decl. ¶ 5; Herter Supp'l Decl. ¶ 2.  No Facebook witness has vouched for the accuracy of those translations or demonstrated that they are competent to do so, nor has Facebook provided any details regarding the "tooling" it used to create them.  Even aside from the potential for wholesale inaccuracy, nuance—which might be important for some the particular statements offered—can easily be lost in automated translation.  Despite some reservations, the undersigned accepts Facebook's similarly thinly substantiated translations of the basic contents of Holper's websites, including that "ИНСТАГРАМ" is a Cyrillic alphabet transliteration of "INSTAGRAM."

United States District Court
Northern District of California

state-law claims under 28 U.S.C. § 1367(a).

Personal jurisdiction is somewhat more complex, given that Holper resides in Belarus, but not significantly so.  "Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same."  *Dole Food Company, Inc. v. Watts*, 303 F.3d 1104, 1110 (9th Cir.2002) (citing Cal. Code Civ. Proc. § 410.10)).  The exercise of specific jurisdiction over a nonresident defendant requires three elements:

> (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; *or* perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Id.* at 1111 (citation omitted).  "[T]he purposeful direction or availment requirement for specific jurisdiction is analyzed in intentional tort cases under the 'effects' test derived from Calder v. Jones, 465 U.S. 783 (1984)," which "requires that the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state."  *Id.*

The undersigned has previously found that a defendant sending a takedown notice under the Digital Millennium Copyright Act to a California company satisfied the test for personal jurisdiction.  *See generally Automattic Inc. v. Steiner,* 82 F. Supp. 3d 1011, 1022–25 (N.D. Cal. 2015).  Similar considerations warrant exercising jurisdiction here.  Facebook is widely known to be headquartered in California.  Taking Facebook's allegations as true, Holper intentionally manipulated Facebook's Instagram platform and infringed its trademarks, predictably causing harm to Facebook in California, from which Facebook's present claims arise.  The undersigned is satisfied that the conduct at issue warrants exercising personal jurisdiction over Holper despite his residence outside of this forum.  *See also Facebook, Inc. v. 9 Xiu Network (Shenzhen) Tech. Co.*, No. 19-cv-01167-JST (AGT), 2021 WL 5707741, at *3–5 (N.D. Cal. Oct. 21, 2021) (finding

9

United States District Court
Northern District of California

1   personal jurisdiction as to a Chinese defendant similarly accused of infringing Facebook's

2   trademarks, cybersquatting, and breaching Facebook's terms of use), *recommendation adopted*,

3   2021 WL 5707740 (N.D. Cal. Nov. 16, 2021).

4         As a separate and sufficient basis for jurisdiction, Holper consented to the jurisdiction of

5   this Court by agreeing to Instagram's terms of use.  *See* Sharpe Decl. Ex. A at ECF p. 42

6   (providing that except for claims by consumers against Facebook, "you agree that the claim must

7   be resolved exclusively in the U.S. District Court for the Northern District of California or a state

8   court located in San Mateo County, that you submit to the personal jurisdiction of either of these

9   courts for the purpose of litigating any such claim, and that the laws of the State of California will

10  govern these Terms and any claim, without regard to conflict of law provisions").  Consent to such

11  a term in a contract is sufficient to establish personal jurisdiction.  *See Automattic*, 82 F. Supp. 3d

12  at 1021–22 (citing, *e.g.*, *S.E.C. v. Ross*, 504 F.3d 1130, 1149 (9th Cir. 2007)).

13        As for service of process, the Federal Rules of Civil Procedure permit service outside of

14  the United States "by other means not prohibited by international agreement, as the court orders."

15  Fed. R. Civ. P. 4(f)(3).  The undersigned previously authorized Facebook to serve Holper by mail

16  and email, dkt. 27, which are not methods prohibited by international agreement, and Facebook

17  completed service in that manner, dkt. 28.

18        **C.   Arbitration Clause**

19        The various versions of the Instagram terms of use that Facebook filed with its

20  supplemental brief include arbitration provisions reading substantially as follows:

21              Except if you opt-out or for disputes relating to: (1) your or
                Instagram's intellectual property (such as trademarks, trade dress,
22              domain names, trade secrets, copyrights and patents); (2) violations
                of the API Terms; or (3) violations of provisions 13 or 15 of the Basic
23              Terms, above ("Excluded Disputes"), you agree that all disputes
                between you and Instagram (whether or not such dispute involves a
24              third party) with regard to your relationship with Instagram, including
                without limitation disputes related to these Terms of Use, your use of
25              the Service, and/or rights of privacy and/or publicity, will be resolved
                by binding, individual arbitration under the American Arbitration
26              Association's rules for arbitration of consumer- related disputes and
                you and Instagram hereby expressly waive trial by jury.
27

28  *E.g.*, Sharpe Decl. Ex. A at ECF p. 13.

1       At least some of the claims at issue here, such as Facebook's trademark claims, are

2  specifically excluded from the arbitration provision as "relating to . . . Instagram's intellectual

3  property." *See id.* In an abundance of caution, the undersigned addresses whether this provision

4  is an impediment to granting default judgment on any other claims.

5       In another case, the undersigned has previously recommended that default judgment be

6  granted despite an apparently applicable mandatory arbitration clause. *Flexible Funding, Ltd. v.*

7  *Hare*, No. 18-cv-03720-JCS, 2019 WL 12872785, at *8–10 (N.D. Cal. Oct. 25, 2019),

8  *recommendation adopted sub nom. Flexible Funding, Ltd. v. Apollo Search Partners LLC*, No.

9  C 18-03720 WHA, 2019 WL 12872783 (N.D. Cal. Dec. 9, 2019). As discussed in *Flexible*

10  *Funding*, a defendant's mere failure to respond to a plaintiff's demands or appear in a judicial

11  action likely does not establish waiver of the defendant's right to demand arbitration. *See id.* at *9

12  (citing, *e.g.*, *Britton v. Co-op Banking Grp.*, 916 F.2d 1405, 1413 (9th Cir. 1990)). That said, "the

13  Federal Arbitration Act requires judicial proceedings to yield to arbitration only when a party

14  affirmatively invokes its right to arbitrate." *Id.* at *10 (citing 9 U.S.C. § 3). While Holper may

15  not have waived any right he might have had to demand arbitration, there is no indication that he

16  has invoked it, and so long as he fails to do so, this case may proceed.

### D.   *Eitel* Factors

18       Several of the *Eitel* factors weigh in favor of granting default judgment against Holper

19  simply because he has not appeared in this action. Since Holper failed to respond to the complaint

20  or otherwise appear in this action, Facebook will be left without a remedy, and therefore

21  prejudiced, if default judgment is not granted. The sum of money is not so high as to weigh

22  against granting judgment to the extent that damages are supported by evidence, an issue

23  discussed separately below. Holper was properly served through multiple channels with

24  Facebook's complaint, and there is no indication that his default is due to excusable neglect.

25  Finally, while there is a strong public policy favoring the resolution of disputes on the merits, that

26  is not possible in this case because Holper has failed to appear to defend the case, and there is no

27  indication that he intends to do so.

28       The remaining factors, "the merits of plaintiff's substantive claim" and "the sufficiency of

United States District Court
Northern District of California

the complaint," are intertwined where, as here, the case has not advanced beyond the pleading stage.  The undersigned addresses each of Facebook's claims in turn.

### 1.    Breach of Contract

Under California law, the "cause of action for damages for breach of contract is comprised of the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff."  *Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.*, 116 Cal. App. 4th 1375, 1391 n.6 (2004).

Facebook sufficiently alleges that Holper agreed to the Instagram terms of use, which incorporate the Community Guidelines and Brand Guidelines, when he created a personal Instagram account.  Compl. ¶ 42.  Facebook's express allegation of its own performance is conclusory, *see id.* ¶ 47, but the allegations of Holper using the various accounts he created to provide fake engagement for his clients support a sufficient inference that Facebook provided Holper with the services contemplated by the terms of use.  Facebook sufficiently alleges breach in that Holper's sale of services to inflate users' "likes" and similar metrics of engagement, *see id.* ¶¶ 32–36, violated the Community Guidelines' prohibition against "artificially collecting likes, followers, or shares," *see id.* ¶ 19, and thus violated the provision of the terms of use that prohibits violating or helping others to violate the Community Guidelines, *see id.* ¶ 17.

To the extent Facebook bases its contract claim on Holper's purported misuse of its trademarks, Facebook is also entitled to judgment on that claim based on its allegations of Holper using the "INSTAGRAM" mark on his websites.  Even though supplemental evidence made clear that Holper generally used the Cyrillic alphabet "ИНСТАГРАМ" rather than the Latin alphabet "INSTAGRAM" as the mark is registered, the brand guidelines, incorporated by the terms of use, specifically provide that the "word Instagram cannot be . . . modified, abbreviated or translated regardless of the surrounding text."  *E.g.*, Sharpe Decl. Ex. A at ECF p. 82.  Facebook has sufficiently shown that Holper breached that restriction.  Moreover, Facebook's allegations of Holper's registration and use of the instagram.by domain sufficiently state a claim for breach of the terms of use, because in at least that instance Holper used Instagram's trademark in a manner not expressly permitted by the Brand Guidelines or by prior written permission.  *See* Compl. ¶ 18;

United States District Court
Northern District of California

1    *e.g.*, Sharpe Decl. Ex. A at ECF p. 9.

2         The undersigned is therefore satisfied that Facebook has sufficiently alleged Holper's

3    breach of contract, and—taking those allegations as true for the purpose of default judgment—that

4    Facebook has presented a meritorious claim.

5         ## 2.    CFAA and Penal Code Section 502

6         > The CFAA prohibits acts of computer trespass by those who are not
     > authorized users or who exceed authorized use. It creates criminal and
7         > civil liability for whoever "intentionally accesses a computer without
     > authorization or exceeds authorized access, and thereby obtains . . .
8         > information from any protected computer." 18 U.S.C.
     > § 1030(a)(2)(C). "The statute thus provides two ways of committing
9         > the crime of improperly accessing a protected computer: (1) obtaining
     > access without authorization; and (2) obtaining access with
10        > authorization but then using that access improperly." *Musacchio v.
     > United States*, [577 U.S. 237, 240] (2016). The CFAA provides a
11        > private right of action for "[a]ny person who suffers damage or loss
     > by reason of a violation of this section." 18 U.S.C. § 1030(g).

12

13   *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1065–66 (9th Cir. 2016).  Other prongs of

14   the statute prohibit "intentionally accessing a protected computer without authorization" and either

15   "caus[ing] damage and loss," 18 U.S.C. § 1030(a)(5)(C), or "recklessly caus[ing] damage," *id.*

16   § 1030(a)(5)(B), as well as knowingly transmitting code or commands to intentionally cause

17   damage to a protected computer, *id.* § 1030(a)(5)(A), and knowingly accessing a protected

18   computer without authorization to further a fraud and obtain something of value, *id.* § 1030(a)(4).

19   A "protected computer" is defined broadly as one that is "used in or affecting interstate or foreign

20   commerce or communication."  18 U.S.C. § 1030(e)(2)(B).

21        The Ninth Circuit has held that the use of Facebook's services after receipt of a cease-and-

22   desist letter violates the CFAA.  *Power Ventures*, 844 F.3d at 1069 ("[W]e hold that, after

23   receiving the cease and desist letter from Facebook, Power intentionally accessed Facebook's

24   computers knowing that it was not authorized to do so, making Power liable under the CFAA.").[3]

25   _____

26   [3] The Supreme Court's recent consideration of the CFAA's phrase "exceeds authorized access" in
     *Van Buren v. United States*, 141 S. Ct. 1648 (2021), does not alter this conclusion.  There, the
27   Court held that "an individual 'exceeds authorized access' when he accesses a computer with
     authorization but then obtains information located in particular areas of the computer—such as
28   files, folders, or databases—that are off limits to him."  *Id.* at 1662.  Here, Facebook contends that

United States District Court
Northern District of California

Facebook alleges that Holper continued to access Instagram (and thus Facebook's servers) to provide fake engagement services after publicly acknowledging receipt of Facebook's letter revoking his access, and in doing so deceived users as to whether engagement on that platform was real and harmed Facebook's goodwill.  *See* Compl. ¶¶ 26–28, 38.  Taking into account *Power Ventures*' holding that continued access after a cease-and-desist letter is not "authorized" for the purpose of the CFAA, the undersigned agrees that the conduct alleged violates at least the "with intent to defraud" and "causes damage and loss" prongs of the statute.  *See* 18 U.S.C. § 1030(a)(4), (a)(5)(C).

Facebook also alleges that its loss of customer goodwill and the cost of its efforts to investigate and stop Holper's conduct meet the CFAA's $5,000 damages threshold, *id.* ¶¶ 39, 64, a position that the Ninth Circuit endorsed on materially indistinguishable facts in *Power Ventures*, 844 F.3d at 1066 ("It is undisputed that Facebook employees spent many hours, totaling more than $5,000 in costs, analyzing, investigating, and responding to Power's actions.  Accordingly, Facebook suffered a loss under the CFAA.").

The language of section 502 of the California Penal Code differs somewhat from the CFAA, providing for a claim where, among other circumstances, a defendant:

> (1) Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data[; or]
>
> (2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.

Cal. Penal Code § 502(c).  Courts have nevertheless generally held that "the necessary elements of Section 502 do not differ materially from the necessary elements of the CFAA," and analyzed such claims together.  *E.g.*, *Multiven, Inc. v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887, 895 (N.D. Cal.

---

after it sent a letter revoking his access, Holper was not authorized to access its servers at all, not that he exceeded some limited degree of authorized access.  The Ninth Circuit's holding in *Power Ventures* remains binding precedent as to such a theory.

2010).

Consistent with Ninth Circuit precedent, the undersigned has previously held that the access-based framework of the CFAA and section 502 applies only to password-protected websites, not to websites made generally available to the public without any requirement to authenticate a right of access. *Meta Platforms, Inc. v. BrandTotal Ltd.*, __ F. Supp. 3d __, No. 20-cv-07182-JCS, 2022 WL 1990225, at *24–25 (N.D. Cal. June 6, 2022) (citing *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1195–96 (9th Cir. 2022)). Here, Facebook alleges that Holper's unauthorized use of its services involved using "thousands of Instagram accounts" to provide fake engagement, implying that Holper has signed into Instagram to use the site in a manner that requires a username and password. The rule of *hiQ* excluding websites that are accessible to the general public without a password from the scope of the CFAA is therefore not a barrier to Facebook's claims in this case.

The undersigned therefore recommends granting default judgment on Facebook's CFAA and section 502 claims.

### 3. Unjust Enrichment

The question of whether "unjust enrichment" is a viable claim under California law remains somewhat unsettled, at least with respect to Ninth Circuit precedent. The Ninth Circuit held in a 2015 decision that no such claim existed, but that courts could "'construe the cause of action as a quasi-contract claim seeking restitution.'" *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (quoting *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221 (2014)).[4] Subsequent unpublished decisions by the Ninth Circuit, which are not precedential but may be considered for their persuasive value, have differed as to whether that remains true, or whether a later 2015 decision by the California Supreme Court recognized such a claim. *Compare Baiul-Farina v. Lemire*, 804 F. App'x 533, 537 (9th Cir. 2020) ("The complaint

___

[4] In its discussion of this claim, Facebook cites only district court decisions predating the Ninth Circuit's holding that such a claim does not exist. Mot. at 15. Moreover, one of those cases addresses restitution only as a remedy under ERISA, a statute not at issue in this case, not as a claim in itself. *Associated Third Party Administrators, Inc. v. Truvillion*, No. C-06-04817 MJJ (EDL), 2007 WL 9728933, at *2 (N.D. Cal. Apr. 17, 2007), *recommendation adopted*, 2007 WL 9728934 (N.D. Cal. Aug. 29, 2007).

United States District Court
Northern District of California

1   alleged an unjust enrichment claim against Ukraine, but '[u]njust enrichment is not a cause of

2   action' under California law." (quoting *McBride v. Boughton*, 123 Cal. App. 4th 379, 387

3   (2004))), *with Bruton v. Gerber Prod. Co.*, 703 F. App'x 468, 470 (9th Cir. 2017) ("But since [the

4   district court decision at issue], the California Supreme Court has clarified California law,

5   allowing an independent claim for unjust enrichment to proceed in an insurance dispute." (citing

6   *Hartford Cas. Ins. Co. v. J.R. Mktg., LLC*, 61 Cal. 4th 988, 1000 (2015))).

7       Facebook has not addressed this question, nor has it clearly argued that a quasi-contract

8   theory would apply to the facts at issue if the Court were to construe its claim as such.  Facebook

9   also requests no relief for its unjust enrichment claim, instead tying its request for damages to its

10  Lanham Act claims, *see* Mot. at 20–22, its request for injunctive relief to its contract, CFAA,

11  section 502, and Lanham Act claims, *see* Mot. at 22–23, and its request for attorneys' fees to its

12  section 502 claim, Mot. at 23.  Since the unjust enrichment claim appears to be irrelevant to the

13  judgment Facebook seeks, and Facebook has not addressed potential uncertainty as to its viability,

14  the undersigned recommends that the Court decline to enter default judgment on this claim.

15              **4.    Cybersquatting**

16      The Lanham Act's cybersquatting provision establishes liability where a defendant "(1) the

17  defendant registered, trafficked in, or used a domain name; (2) the domain name is identical or

18  confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant acted with

19  bad faith intent to profit from that mark." *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218–19

20  (9th Cir. 2010); *see* 15 U.S.C. § 1125(d); *Amazon.com, Inc. v. Expert Tech Rogers Pvt. Ltd.*, No.

21  20-cv-07405-PJH (JSC), 2021 WL 4461601, at *7 (N.D. Cal. Sept. 22, 2021), *recommendation*

22  *adopted*, 2021 WL 4896120 (N.D. Cal. Oct. 20, 2021).

23      Holper's registration of the instagram.by domain, and his use of that domain for his email

24  address in conjunction with his business selling fake engagement in violation of Instagram's terms

25  of use, meets each of those elements.  The undersigned recommends that default judgment be

26  granted as to Facebook's cybersquatting claims.

27              **5.    Other Trademark Claims**

28      Facebook brings several other Lanham Act claims, all based on Holper's purported use of

United States District Court
Northern District of California

the "INSTAGRAM" mark on his websites: an infringement claim under 15 U.S.C. § 1114, Compl. ¶¶ 77–86; a false designation of origin claim under § 1125(a), Compl. ¶¶ 87–97; and a dilution claim under § 1125(c), Compl. ¶¶ 98–106.

The Lanham Act requires a plaintiff pursuing a trademark infringement claim to present evidence of a valid mark, that the mark has been used in commerce, and that the defendant's use of the mark is likely to cause confusion, or mistake, or to deceive as to sponsorship, affiliation, or the origin of the goods or services in question.  15 U.S.C. §§ 1114, 1125(a); *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir. 1985).  Here, Facebook has sufficiently alleged that its INSTAGRAM mark is registered and valid, that it uses the mark in commerce.  Compl. ¶¶ 20–22 & Ex. 2.  On default judgment, those allegations are taken as true, and are sufficient to establish those elements of the claim.

As for Holper's use of the mark, even though he has primarily used the Cyrillic text "ИНСТАГРАМ" rather than "INSTAGRAM," *see* Andre Decl. Exs. C–D, courts have generally recognized direct transliterations of a trademark as sufficiently similar to support a likelihood of confusion.  *E.g.*, *Dor Yeshurim, Inc. v. A Torah Infertility Medium of Exch.*, No. CV 10-2837 JFB WDW, 2011 WL 7285038, at *3–4 (E.D.N.Y. Aug. 10, 2011), *recommendation adopted*, 2012 WL 464000 (E.D.N.Y. Feb. 10, 2012); *Vantone Grp. Liab. Co. v. Yangpu NGT Indus. Co.*, No. 13CV7639-LTS-MHD, 2015 WL 4040882, at *5 (S.D.N.Y. July 2, 2015).  Facebook's allegations as to this element are plausible and sufficient to support its claim.

The Lanham Act's false designation of origin provision prohibits using in commerce, "on or in connection with any goods or services, . . . any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."  15 U.S.C. § 1125(a).  As in an action for trademark infringement under 15 U.S.C. § 1114(1)(a), the key question for a false designation of origin claim under § 1125(a) is "whether the public is likely to be deceived or confused by the similarity of the marks."

17

*Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir.1988) (quoting *New West Corp. v. NYM Co.*, 595 F.2d 1194, 1201 (9th Cir. 1979)).  Again, Facebook has met that standard—particularly with respect to the copyright notices at the bottom of Holper's websites suggesting that the websites are themselves Instagram's intellectual property or that such intellectual property is with permission.  *See* Compl. ¶ 25.

In order to prove a dilution claim under the Lanham Act, "a plaintiff must show that (1) the mark is famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark is likely to cause dilution by blurring or dilution by tarnishment." *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 634 (9th Cir. 2008) (citing *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1324 (9th Cir. 1998.  For largely the same reasons discussed above, Facebook has sufficiently alleged each of those elements here.

To the extent any "argument could be made that [Holper] was employing nominative fair use, . . . that is a defense that must be raised during litigation."  *Yelp Inc. v. Catron*, 70 F. Supp. 3d 1082, 1095 (N.D. Cal. 2014) (citing *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1175 (9th Cir. 2010)).  Since Holper did not appear and assert fair use or any other affirmative defense, the undersigned declines to consider such defenses.

The undersigned therefore recommends that default judgment be GRANTED as to Facebook's Lanham Act claims.

### E.    Relief Sought

Once liability is established through a defendant's default, a plaintiff is required to establish that the requested relief is appropriate.  *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 560 (9th Cir. 1977) (citing *Pope v. United States*, 323 U.S. 1, 12 (1944)).  The plaintiff must submit proof of their damages rather than relying on the allegations of their complaint.  *See TeleVideo*, 826 F.2d at 917–18.

#### 1.    Statutory Damages

Facebook seeks statutory damages on its Lanham Act claims.

Beginning with the cybersquatting claim, the statute permits a plaintiff to elect "an award

United States District Court
Northern District of California

of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just."  15 U.S.C. § 1117(d).  Here, Holper's registration of instagram.by (a domain that, except for the country suffix, consists solely of Facebook's "INSTAGRAM" mark), and his use of that domain to conduct a business based entirely on clear violations of the Instagram terms of use, represents an egregious violation of § 1125(d).  By failing to appear in this case or engage with Facebook's demands that he cease his infringement, Holper has also deprived Facebook of any ability to determine the extent to which he used the infringing domain to fraudulently present himself as an official representative of Instagram. Holper's use of the instagram.by domain is supported by evidence, in that the screenshot of one of Holper's website attached to investigator Andrew Herter's declaration includes Holper's info@instagram.by email address in its listing of contact information.  Herter Decl. Ex. A; *see also* Andre Decl. Exs A–C (including "info@instragram.by" in the Latin alphabet even in the original Cyrillic alphabet versions of the websites).  The undersigned recommends awarding the maximum $100,000 damages for Facebook's cybersquatting claim.

Turning to Facebook's non-cybersquatting trademark claims, the Lanham Act provides for statutory damages for use of a counterfeit mark, as follows:

> (1) not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or

> (2) if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.

15 U.S.C. § 1117(c).  Facebook relies on this subsection and cites no other basis for statutory damages for its non-cybersquatting claims.

As a starting point, Facebook asserts three instances of infringement, based on three websites where Holper used its "INSTAGRAM" mark.  That premise is questionable in light of Facebook's investigator's declaration that "[a]s of December 17, 2021, the nakrutka.by website redirects individuals that visit that domain to nakrutka.com," and no clear indication that the screenshot taken nakrutka.by several months earlier in fact represented a separate website rather

1    than the content of nakrutka.com.  Regardless, the Lanham Act does not calculate statutory

2    damages based on the number of instances of a mark or the number of websites where it appears,

3    but instead based on the number of marks infringed and the number of "type[s] of goods or

4    services sold" or offered.  15 U.S.C. § 1117(c); *see Expert Tech Rogers Pvt. Ltd.*, No. 20-cv-

5    07405-PJH (JSC), 2021 WL 4461601, at *9.  There is no indication that Holper used more than

6    one mark, or that he used it to offer more than one "type of . . . services."

7         More fundamentally, though, Facebook has not sufficiently demonstrated the use of a

8    "counterfeit mark," as required for statutory damages under § 1117(c).  While Facebook's briefs

9    address that subsection as if it applies to any form of trademark infringement, courts and

10   commentators have noted that "counterfeiting" is something more than typical infringement:

> As one district court has explained, "counterfeiting is the 'hard core' or 'first degree' of trademark infringement that seeks to trick the consumer into believing he or she is getting the genuine article, rather than a 'colorable imitation.' " *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 242 (S.D.N.Y. 2012) (citing 4 McCarthy on Trademarks § 25:10); *see also* McCarthy, § 25.01[5][b] ("[T]he Lanham Act carves out 'counterfeit' as a more egregious type of 'colorable imitation.' When courts have used the term 'counterfeit,' it has usually been In the context of invoking greater discretionary remedies.").

17   *Gibson Brands, Inc. v. John Hornby Skewes & Co.*, No. CV 14-00609 DDP (SSx), 2016 WL

18   7479317, at *5 (C.D. Cal. Dec. 29, 2016).

19         The Ninth Circuit has set forth particular elements required to invoke damages under

20   § 1117(c):

> Section 1117(c) allows a plaintiff to opt for statutory damages in cases involving the use of a counterfeit mark. 15 U.S.C. § 1117(c). . . . In order to invoke § 1117's special civil monetary remedies against counterfeiting, [a plaintiff] must establish that: (1) [the defendant] intentionally used a counterfeit mark in commerce; (2) knowing the mark was counterfeit; (3) in connection with the sale, offering for sale, or distribution of goods; and (4) its use was likely to confuse or deceive. *See* McCarthy § 25:15 (citing 15 U.S.C. §§ 1114(1)(a), 1117(b)). In this context, the mark used by [the defendant] was counterfeit if: (1) it was a non-genuine mark identical to [the plaintiff's] mark; (2) [the plaintiff's] mark was registered on the Principal Register for use on the same goods to which [the defendant] applied the mark; (3) [the plaintiff's] mark was in use; and (4) [the defendant] was not authorized to use [the plaintiff's] mark on [the product at issue]. *See id.* (citing 15 U.S.C. §§ 1116(d)(1)(B), 1127).

United States District Court<br>Northern District of California

*Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708, 720–21 (9th Cir. 2005); *see also Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 946 (9th Cir. 2011) (citing *Idaho Potato* for the rule that statutory damages under § 1117(c) only when "the mark in question [is] (1) a non-genuine mark identical to the registered, genuine mark of another, where (2) the genuine mark was registered for use on the same goods to which the infringer applied the mark").

Facebook has not addressed or attempted to satisfy the requirement that a counterfeit mark must be "identical" to the registered mark.  Facebook cites a three district court cases recognizing marks as supporting a likelihood of confusion.  Supp'l Br. at 3.  One of those cases says nothing about whether the marks are "identical," nor does it address counterfeiting damages under § 1117(c).  *Dor Yeshurim*, 2011 WL 7285038, at *4–7 (finding a likelihood of confusion, noting that the applicable standard did not require marks to be identical, declining to award damages under § 1117(a), and not discussing § 1117(c)).  A second case describes two marks based on kanji[5] characters and using similar Latin transliterations as "practically identical" and sufficient to support a likelihood of confusion, but does not address counterfeiting or damages.  *Munhwa Broad. Corp. v. Solafide, Inc.*, No. SA CV 07-699 DOC (ANx), 2007 WL 2667451, at *2, *5–6 (C.D. Cal. July 16, 2007).  The third case describes a transliterated mark as "identical" in a passing reference (which Facebook's brief does not discuss), but again does not address counterfeiting or damages.  *Vantone Grp.*, 2015 WL 4040882, at *5 (denying a motion to dismiss an infringement claim under Rule 12(b)(6)).  The undersigned is aware of no case awarding damages under § 1117(c) where the infringing mark used a different alphabet from the registered mark.

The Cyrillic text "ИНСТАГРАМ" appearing on Holper's websites may have the same meaning as "INSTAGRAM," but it is a different set of letters with a distinctly different appearance.  Accordingly, while the undersigned accepts that Holper's Cyrillic transliteration is

---

[5] Kanji is a system of Chinese characters used to write Japanese.  Although the court in *Munhwa Broadcasting* described the mark at issue as using kanji, the case concerned a Korean television show, so it seems likely that the mark actually used the *hanja* system of writing *Korean* using Chinese characters.  The distinction does not appear to have been important to that case and is of no consequence to this one.  This report refers to the mark in *Munhwa Broadcasting* as using kanji for consistency with the terminology used in that decision.

United States District Court
Northern District of California

1  sufficiently similar to support a likelihood of confusion, Facebook has not met its burden to show

2  that it is an "identical" mark for the purpose of "§ 1117's special civil monetary remedies against

3  counterfeiting."  *See Idaho Potato*, 425 F.3d at 720; *see also Pogrebnoy v. Russian Newspaper*

4  *Distribution, Inc.*, 289 F. Supp. 3d 1061, 1070 (C.D. Cal. 2017) (treating "Kurier" and the

5  apparently equivalent Cyrillic "Курьер" as two different marks, in a case where that approach

6  does not seem to have been a subject of dispute), *aff'd*, 742 F. App'x 291 (9th Cir. 2018); *Munhwa*

7  *Broad.*, 2007 WL 2667451, at *2 (noting that one of the parties filed separate applications for a

8  kanji character logo and its Latin alphabet transliteration as two different marks).

9       Facebook also asserts that "modern internet browsers translate foreign languages into the

10  user's preferred language," such that "anyone who accesses the Nakrutka Websites and whose

11  preferred language uses Latin letters will see the INSTAGRAM Mark exactly as written here:

12  INSTAGRAM."  Supp'l Br. at 3.  Facebook has offered no evidence to support the assertion in its

13  supplemental brief that "anyone" who accesses Holper's websites would see them translated and

14  transliterated into the user's preferred language and writing system.  Nor has it cited any authority

15  to suggest that the automated actions of a third party's web browser can create liability under

16  section 1117(c) for someone whose website, in its native form, uses a non-identical mark.

17       The undersigned therefore recommends that Facebook's motion be DENIED as to

18  statutory damages under § 1117(c).[6]

19              **2.      Injunctive Relief**

20       Facebook asks the Court to enter a permanent injunction against Holper as set forth

21  beginning on page 1, line 16 of its proposed order (dkt. 39-2).  To obtain a permanent injunction,

22  Facebook "must demonstrate: (1) that [it has] suffered an irreparable injury; (2) that remedies

23  available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that,

24

25  ───────────────

[6] Holper's registration and use of the domain name "instagram.by," which uses the Latin alphabet
26  and thus the identical text of Facebook's registered marks, could perhaps support counterfeiting
    damages, but in light of the more specific statutory provision addressing cybersquatting discussed
27  above, the undersigned finds the maximum statutory damages available under § 1117(d) to be
    sufficient compensation for that violation, without also resorting to § 1117(c) to provide additional
28  damages for the same conduct.  Facebook has not argued that Holper's use of that domain name
    warrants damages under § 1117(c).

United States District Court
Northern District of California

considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  All of these requirements are satisfied here.

Irreparable harm is "that for which compensatory damages are unsuitable."  *MGM Studios, Inc. v. Grokster, Ltd.*, 518 F.Supp.2d 1197, 1210 (C.D. Cal. 2007) (quoting *Wildmon v. Berwick Universal Pictures*, 983 F.2d 21, 24 (5th Cir. 1992)).  "Likelihood of future infringement, therefore, generally leads to a finding of irreparable harm 'given the difficulty of protecting a right to exclude through monetary remedies that allow an infringer to use [a protected work] against the [rightholder's] wishes.'"  *Sanrio, Inc. v. Torres*, No. CV14-03736 MMM (JCx), 2015 WL 12661916, at *10 (C.D. Cal. Jan. 5, 2015) (quoting *eBay*, 547 U.S. at 395 (Roberts, C.J., concurring)).  The facts here support a finding that Facebook faces a threat that Holper will continue to use Facebook's marks, violate its terms of use, and access its servers without permission in the absence of a permanent injunction.  In particular, the undersigned takes judicial notice that Holper's infringing websites remain available advertising his services in substantially the same form even after he received notice of this lawsuit.  *See, e.g.*, www.nakrutka.com (accessed September 27, 2022).

Holper's default further supports the conclusion that a permanent injunction is necessary because monetary damages will be inadequate to protect Facebook's trademark rights.  *See Warner Bros. Home Entm't Inc. v. Jimenez*, No. CV 12-9160 FMO JEMX, 2013 WL 3397672, at *7 (C.D. Cal. July 8, 2013) ("[M]onetary damages alone are inadequate to compensate plaintiff because defendant's refusal to participate in the action makes it impossible for plaintiff to determine defendant'ss actual profits, the amount of lost income as a result of defendant's conduct, or take any action to prevent further infringement.").

The balance of the hardships also weighs in favor of entering a permanent injunction "because defendant faces no cognizable hardship in refraining from future infringement of plaintiff's copyrighted works," *id.*, or from compliance with the terms of use to which he agreed, or from lack of access to websites he has no right to use after Facebook revoked permission.

23

Finally, the public interested is not disserved by entry of a permanent injunction because it is in the public interest to protect the rights of trademark holders and to prevent infringing conduct that is likely to deceive and confuse consumers, *see Sanrio*, 2015 WL 12661916, at *11, as well as the other unlawful conduct at issue.

The undersigned therefore recommends that Facebook's request for a permanent injunction be GRANTED.  The undersigned has reviewed the specific language of the proposed permanent injunction, and finds that it is "narrowly tailored . . . to remedy only the specific harms shown by the plaintiffs, rather than 'to enjoin all possible breaches of the law.'"  *Iconix, Inc. v. Tokuda*, 457 F. Supp. 2d 969, 998 (N.D. Cal. 2006) (quoting *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004)).  The specific language of the proposed order pertaining to injunctive relief should therefore be adopted.

### 3. Attorneys' Fees and Costs

Section 502 of the California Penal Code allows a prevailing plaintiff to recover its reasonable attorneys' fees.  Cal. Penal Code § 502(e)(2).  Rule 54(d)(1) of the Federal Rules of Civil Procedure permits a prevailing plaintiff to recover its litigation costs other than attorneys' fees.  Facebook here seeks fees totaling $178,702 and costs totaling $10,184.44.

Facebook's attorneys' hourly rates—$530 per hour for second-year associates, Mortimer Decl. ¶¶ 10–11, up to $725 per hour for a senior associate with significant practice experience, *id.* ¶ 9, up to $780 per hour for a counsel with nearly twenty years of experience, *id.* ¶ 8, and up to $1,165 per hour of an office managing partner with thirty years of experience who spent only four hours on the case, *id.* ¶ 7—are within the reasonable range of the local market.  The undersigned is not satisfied, however, that all of the time spent on the case was reasonably incurred.  In light of Facebook's attorneys' failure to address key issues (like website translations) in their original motion, failure to achieve success on the bulk of their request for statutory damages, and facially unreasonable amounts of time spent on relatively straightforward phases of the case,[7] the

[7] For example, "approximately 35.9 hours to prepare and file multiple motions to continue case management conferences and multiple case management statements and to prepare for and appear at the case management conferences" in this case where the defendant never appeared, Mortimer

United States District Court
Northern District of California

undersigned recommends a forty-percent reduction in the award of attorneys' fees, for a total award of $107,221.20. *See Fox v. Vice*, 563 U.S. 826, 838 (2011) ("The essential goal in shifting fees is to do rough justice, not to achieve auditing perfection.").

Facebook's costs are well substantiated and largely reflect the difficult task of attempting service under the Hague Convention in Belarus. Facebooks attorneys have exercised billing judgment in not including legal research costs in their request. Mortimer Decl. ¶ 16 & Exs. B–D. The undersigned recommends that the requested costs be awarded in full.

## IV.    CONCLUSION

The undersigned recommends that Facebook's motion for default judgment be GRANTED IN PART and DENIED IN PART, for the reasons discussed above. The undersigned recommends that judgment be entered against Holper in the total amount of $217,405.64 (consisting of $100,000 in statutory damages for cybersquatting, $107,221.20 in attorneys' fees, and $10,184.44 in costs), and that a permanent injunction be entered consistent with the terms of Facebook's proposed order.

Facebook is ORDERED to serve a copy of this report on Holper by the same methods the undersigned previously authorized for serving the complaint, and to file proof of service to that effect.

This case will be reassigned to a United States district judge for all further proceedings, including action on the recommendations of this report. Any party may file objections to these recommendations no later than fourteen days after being served with a copy of this report.

/ / /

Dated: September 27, 2022

_____
JOSEPH C. SPERO
Chief Magistrate Judge

---

Decl. ¶ 13, and "approximately 71.3 hours researching, drafting, and arguing Plaintiffs' motion for alternative service," *id.* ¶ 14.